# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

Assigned on Briefs February 3, 2015

## STATE OF TENNESSEE v. SCOTT LEE

**Appeal from the Criminal Court for Shelby County**
**No.11-03839     James C. Beasley, Jr.,  Judge**

---

**No. W2014-00986-CCA-R3-CD  -  Filed June 25, 2015**

---

The defendant, Scott Lee, was convicted by a Shelby County Criminal Court jury of first degree murder in the perpetration of attempted robbery; two counts of attempted second degree murder, Class B felonies; aggravated robbery, a Class B felony; employing a firearm during the commission of a felony, a Class C felony; and felon in possession of a firearm, a Class E felony.  He was sentenced to an effective term of life plus forty-five years in the Tennessee Department of Correction.  On appeal, he argues: (1) that the trial court erred in denying his motion in limine to keep his prior convictions listed in Count 6 of the indictment from being heard and seen by the jury, and (2) that the evidence is insufficient to sustain his convictions.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., concurred.  CAMILLE R. MCMULLEN, J., filed a concurring opinion.

Harry E. Sayle, III (on appeal), Robert Felkner and Michele Lynn (at trial), Assistant Public Defenders, for the Appellant, Scott Lee.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pamela Fleming-Stark and Reginald Henderson, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

## FACTS

The proof at trial showed that during the late night hours of September 17, 2010, the defendant and co-defendant, Calvin Rogers, followed and fired multiple shots at a car occupied by three men after the men declined their offer to provide the men with drugs and prostitutes. As a result, the defendant was indicted for the first degree murder of Ameer Althaibani in the perpetration of robbery, the attempted second degree murder and aggravated robbery of Dhaiban Mohammed, the attempted second degree murder of Fazil Rahman, employing a firearm during the commission of a felony, and felon in possession of a firearm.[1] We will attempt to limit our recitation of the testimony at trial to that relevant to the defendant's issues on appeal.

Sultan Althaibani, the victim's father, testified that he last spoke with his son on September 17, 2010, when the victim was working at the store owned by his cousin, Dhaiban Mohammed. Mr. Althaibani learned early the next morning that the victim had been killed.

Dhaiban Mohammed testified that, on September 17, 2010, around 10:00 p.m., he picked up his cousin, the victim, and his classmate, Fazil Rahman, from their jobs in Bartlett, Tennessee, to take both men home. As Mr. Mohammed was driving on Sam Cooper Boulevard in his Nissan Maxima toward Highland Street, he mistakenly missed the Highland Street exit because he was talking with the other men and not paying attention. He got off at the next exit, Hollywood Street, and drove to Poplar Avenue where he stopped at a service station to buy a soda.

At the service station, Mr. Mohammed noticed two men in a silver "old model" car. However, at some point, the driver of the other car got out of his car and talked to the service station clerk. As Mr. Mohammed was returning to his car, the two men hailed him over to their car and invited him and his friends to a party. Mr. Mohammed told them that he did not want to go to a party and walked back to his car, which was parked next to a gas pump. The men then pulled their car up beside Mr. Mohammed's car with their car facing the opposite direction. The driver spoke to Mr. Mohammed, offering "to get [them] some drugs and some prostitutes." Mr. Mohammed responded that he was "good" and that he needed to get home because it was late and he had to work the next morning.

Mr. Mohammed left the service station, driving on Hollywood Street toward Sam Cooper Boulevard. He turned right off of Hollywood and observed the car from the service station pass him. The car stopped at a stop sign, and Mr. Mohammed stopped behind it. The two men got out of their vehicle, each holding a gun. One man

---

[1] Because there are multiple victims in this case, we will refer to the victim of the felony murder as "the victim" and the remaining victims by surname.

approached the driver's side, and the other man approached the passenger's side where the victim and Mr. Rahman were sitting. The man on the driver's side pointed a gun to Mr. Mohammed's head and demanded money. Mr. Mohammed gave money to the man, but the man threatened that he was going to kill them and tried to open the door. Thinking he was going to die, Mr. Mohammed hit the gas on his car and drove away.

As Mr. Mohammed drove away, both men fired several shots at his car. The victim was hit with a bullet on his right side, and blood started pouring out of his mouth. Mr. Mohammed drove to the first open service station that he saw and called 911. Mr. Mohammed remained at the service station until the police and an ambulance arrived, but the victim was already dead. The police put Mr. Mohammed in the backseat of a patrol car and eventually transported him to the police station, where he spoke to the police. The next day, the police visited Mr. Mohammed's house and showed him a photographic array, from which he identified the man who stood on the driver's side door and pointed a gun at him. Mr. Mohammed said that he only paid attention to the man on his side of the car.

Fazil Rahman testified that he was working in Bartlett, Tennessee, on September 17, 2010. Mr. Rahman's car was broken down, so a classmate of his, Mr. Mohammed, and Mr. Mohammed's cousin, the victim, picked him up from his job around 11:00 p.m. Mr. Rahman sat in the backseat on the passenger side, and the victim sat in the front passenger seat. Mr. Mohammed drove down Sam Cooper Boulevard toward Highland Street, but he missed his exit because they were talking and joking. Mr. Mohammed took the exit for Hollywood Street and drove toward Poplar Avenue.

When they got to Poplar Avenue, Mr. Mohammed decided to stop at a service station to buy "some drinks and some chips." Mr. Rahman walked toward the store to buy a drink but stopped when he saw two men talking to Mr. Mohammed. One of the men was bald, wore a white tee shirt, held a puppy on a leash, and was standing outside a silver, four-door Honda talking to the store clerk. The other man, whom Mr. Rahman identified as the defendant, sat inside the silver Honda and had dreadlocks and a "heavy" mustache. Mr. Mohammed told Mr. Rahman that the men had asked if "they want[ed] drugs and girls or do we want to have a party," and Mr. Mohammed had told the men that they were not interested. Mr. Mohammed went on and purchased a soda at the store, but Mr. Rahman decided to return to the car instead. After Mr. Mohammed got back to the car, the two men pulled their car up next to Mr. Mohammed's car and again asked the men if they wanted anything, and Mr. Rahman responded that they did not want.

Mr. Mohammed drove away from the gas station. Mr. Rahman suggested that they take what he believed to be a shortcut back to Sam Cooper Boulevard, rather than drive down Poplar all the way to Highland. They drove down Hollywood and then

turned on a street, thinking it was a shortcut. As Mr. Mohammed approached a stop sign, out of nowhere, the silver car from the service station passed quickly in front of Mr. Mohammed's car and stopped near the stop sign. They had not realized that the silver car had been following them until that point. One of the men in the silver car turned off the car's headlights and turned on the interior lights.

Mr. Rahman told Mr. Mohammed to be careful and not turn off the car. Mr. Rahman saw the bald man, the silver car's driver, approach Mr. Mohammed on the driver's side, point a gun at him, and demand all of his money. When a shocked Mr. Rahman looked up, he saw the defendant, the silver car's passenger, standing on the passenger's side of Mr. Mohammed's car demanding that he and the victim give him money. Mr. Rahman tried to give the defendant his wallet, money, and keys, but stopped when the bald man ordered Mr. Mohammed to step out of the car and threatened that "ya'll three is going to get killed tonight anyway."

Mr. Rahman heard the bald man click his gun and, believing they were "going to get killed anyway," very quietly told Mr. Mohammed to push the gas pedal. When Mr. Mohammed pushed the gas, bullets started coming from everywhere. Mr. Rahman felt bullets hit and penetrate the car from both sides. He estimated that he heard seventeen or eighteen gunshots. A bullet hit the victim during their escape, and Mr. Rahman saw blood coming from the victim's mouth and placed his hand on the victim's neck. Mr. Rahman thought that he, himself, had five or six shots in his back because he could not feel or hear anything. He then felt a bullet hit his leg.

Mr. Mohammed pulled into a service station, and they called the police. When the police arrived, they informed the police that they had been carjacked and robbed. The police transported Mr. Rahman first to the hospital to have his leg examined and then to the police station where they took his statement. The following day, the police showed Mr. Rahman a photographic array at his house, from which he identified the bald man, the driver of the silver car, and noted that he was 75% sure of his identification. He was only 75% sure because he had not been focused on the bald man because the bald man stood on Mr. Mohammed's side of the car.

A few days later, police showed Mr. Rahman another photographic array, from which he identified the defendant and wrote: "I don't know him and I don't know his name. He robbed us and he shot us and he was [o]n the right side of the car on passenger right side." Mr. Rahman said that he was 100% sure of his identification of the defendant. Mr. Rahman recalled the defendant's face from the service station and when he stood on Mr. Rahman's side of the car trying to rob them. Mr. Rahman subsequently identified the defendant at a preliminary hearing as well.

Lieutenant James Max of the Memphis Police Department testified as to his participation in the investigation of the victim's homicide. As part of his investigation, Lieutenant Max viewed the surveillance video from the Shell service station at the corner of Poplar and Hollywood. The video showed three views: one focusing on the cashier, one focusing on the business's front door, and an outside view facing east on Hollywood. At the time of the video, the store was locked and in security mode, meaning customers were not allowed in the store and all purchases had to be made at a window. The video showed the store clerk, Vernadette Neeley, talking to a man with a small dog at the front door, and Ms. Neeley unlocking the door and stepping outside and continuing to talk to the man.

Based on what he saw on the surveillance video, Lieutenant Max developed Calvin Rogers as a suspect. He prepared a photographic array that included Mr. Rogers' photo and showed it to Mr. Mohammed at his home. In order to protect the integrity of the case, another officer visited Mr. Rahman at his home and showed him the same array at the same time that Lieutenant Max showed the array to Mr. Mohammed. The officers made every effort to show Mr. Mohammed and Mr. Rahman the arrays simultaneously. Mr. Mohammed immediately identified Mr. Rogers from the array of six photographs.

Within a couple of days, the defendant was developed as the other suspect. Lieutenant Max was aware that one of the victims identified the defendant from a photographic array. Arrest warrants were obtained for the defendant and Mr. Rogers, and Lieutenant Max sent a task force to search for the two suspects. The defendant was arrested approximately six weeks after the incident, and Mr. Rogers was arrested approximately six months after the incident.

Officer Christopher Sanders, a crime scene investigator with the Memphis Police Department, processed and collected evidence from both the scene where the shooting occurred as well as the scene to where the victims fled to seek aid. Officer Sanders collected one spent .380 shell casing and eight nine-millimeter shell casings from the scene of the shooting. Officer David Payment, also a crime scene investigator with the Memphis Police Department, processed the victims' vehicle and notated its damage. He collected several projectiles and bullet fragments from the car.

Vernadette Neeley, Calvin Rogers' former girlfriend, testified that she was working at the Flash Market service station at the corner of Hollywood and Poplar on September 17, 2010. Her shift began at 11:00 p.m., at which time the store was locked and she served customers from a window. That night, she spoke with Mr. Rogers outside the store, and he brought her a puppy. Ms. Neeley recalled that there was another man in Mr. Rogers' vehicle, a dark-skinned man with dreadlocks and a thick mustache. Ms. Neeley later identified a photograph of Mr. Rogers from a photographic array.

Gabrielle Lee, the defendant's sister, identified the defendant in the courtroom and in a photographic array. She stated that Mr. Rogers is her second cousin and identified him in an array. She said that Ms. Neeley was Mr. Rogers' former girlfriend.

Ruby Myatt testified that she had known Mr. Rogers for fifteen or twenty years and they had dated. Ms. Myatt could not recall the exact date, but sometime in September 2010 before the incident occurred, Mr. Rogers and his cousin visited her house and she took them with her to the home of her friend, Ashley. After Mr. Rogers and his cousin left Ashley's house, Ms. Myatt learned that Ashley's pit bull puppy was missing.

Officer Trey Norris of the Memphis Police Department participated in the apprehension of the defendant on October 29, 2010, and brought him into custody.

Special Agent Steve Scott, a forensic scientist in the Firearms Identification Unit of the Tennessee Bureau of Investigation, tested the evidence in the case and compiled an official firearms report. He determined that cartridge cases recovered from the scene were fired from two different weapons.

Dr. Marco Ross with the Shelby County Medical Examiner's Office performed an autopsy on the victim on September 18, 2010. Dr. Ross detailed the various gunshot wounds sustained by the victim, and he opined that the victim died as a result of a gunshot wound to the chest.

Wanda Wright, an employee with the Shelby County Criminal Court Clerk's Office, maintained the records of the defendant's prior convictions. Her records showed that the defendant had previously been convicted of five felonies: aggravated robbery, two attempted robberies, theft valued over $1000, and escape.

Following the conclusion of the proof, the jury convicted the defendant as charged of first degree murder in the perpetration of attempted robbery, two counts of attempted second degree murder, aggravated robbery, employing a firearm during the commission of a felony, and felon in possession of a firearm.

## ANALYSIS

### I. Prior Convictions

The defendant first argues that the trial court erred in denying his motion in limine to keep his prior convictions listed in Count 6 of the indictment from being heard and

seen by the jury. He asserts that allowing the jury to hear about his prior convictions "greatly prejudice[d] the jury" in determining his guilt for the present charges.

The record shows that Count 6 of the indictment, charging the defendant with felon in possession of a firearm, detailed that the defendant had previously been convicted of aggravated robbery, two counts of attempted robbery, theft of property over $10,000, theft of property over $1,000, and escape from felony incarceration. Before the reading of the indictment, the defendant asked that the prior convictions be redacted from the indictment so the jury would not learn of them, but the State asserted that it had to prove the convictions as an element of the offense. The court determined that the State had to prove that the defendant had a prior felony conviction in order to prove that the defendant was a convicted felon in possession of a handgun.

Prior to the testimony of Wanda Wright of the criminal court clerk's office, the defendant renewed his objection, asserting that the admission of his record was unfairly prejudicial. The court commented that it did not necessarily disagree with the defendant that it was prejudicial but that "the way the case was indicted and under the law[,] [the State] ha[d] a right to do that." After Ms. Wright's testimony and again during final jury instructions, the trial court instructed the jury that it was to consider proof that the defendant had previously been convicted of other crimes only as that related to its consideration of the charge of felon in possession of a handgun.

In considering this issue, we apply the rule that "admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004). See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court's exercise of discretion will only be reversed on appeal if the court "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Robinson, 146 S.W.3d at 490 (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

When determining admissibility, a trial court must first decide if the evidence is relevant. Tenn. R. Evid. 402 ("All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible."); Robinson, 146 S.W.3d at 490. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403.

Evidence of a defendant's prior crimes is not admissible to show that the defendant acted in conformity with the prior bad acts. Tenn. R. Evid. 404(b). However, evidence of a defendant's prior conduct is admissible if a material issue exists other than conduct conforming to a character trait, and the probative value outweighs the danger of unfair prejudice. Id.

The defendant asserts that under Harrison v. State, 394 S.W.2d 713, 717 (Tenn. 1965), it was prejudicial error for the jury to hear evidence of his prior convictions, and that the "similarity between the charged crimes and the prior convictions is too great, and the prior convictions bear no relevance to the charges in the indictment other than count six." However, the trial court properly exercised its discretion in allowing the State to introduce evidence of the defendant's prior convictions because the State was required to prove that the defendant had committed prior felonies to prove the charge of convicted felon in possession of a handgun, and the defendant failed to stipulate that he was a convicted felon.

Tennessee courts have "long held that the name or nature of crimes other than that for which the defendant is on trial is relevant to establish an essential element of the crime for which the defendant is being tried." State v. James, 81 S.W.3d 751, 760 (Tenn. 2002) (citing State v. Wingard, 891 S.W.2d 628, 633-34 (Tenn. Crim. App. 1994); State v. Blackmon, 701 S.W.2d 228, 232 (Tenn. Crim. App. 1985); Lacey v. State, 506 S.W.2d 809, 811 (Tenn. Crim. App. 1974). However, when evidence of a defendant's prior conviction is necessary to prove the status element of an offense, the defendant may offer to stipulate his status as a felon. See James, 81 S.W.3d at 762. In the limited circumstance when the sole purpose of introducing evidence of a defendant's prior convictions is to prove the status element of an offense and the defendant offers to stipulate his status as a felon, the probative value of the evidence is, as a matter of law, outweighed by the risk of unfair prejudice. Id. When there is no stipulation, however, the "probative value of an essential element of the offense would almost always outweigh any potential prejudice under Rule 404(b) [of the Tennessee Rules of Evidence], [and therefore the] specific nature of the offense [would be] admissible." Wingard, 891 S.W.2d at 634, overruled on other grounds by James, 81 S.W.3d at 763 n.7.

The defendant has failed to show that the trial court abused its discretion in allowing the State to introduce evidence of his prior convictions to prove an essential element of the charge of convicted felon in possession of a handgun. In denying the motion for new trial, the trial court found that it had properly followed the law by allowing the State to introduce such evidence and noted that it instructed the jury that it could only consider the defendant's prior record in regards to the charge of convicted felon in possession of a handgun and the court believed that the jury followed the court's

instruction.  The record shows that the defendant failed to offer to stipulate that he was a convicted felon and, therefore, the probative value of the defendant's prior convictions outweighs the prejudicial effect due to the fact the convictions were an essential element of an offense the State had to prove.  Furthermore, the trial court avoided any potential prejudice by issuing limiting jury instructions regarding any such proof, and the jury is presumed to follow the instructions of the court.  See State v. Johnson, 401 S.W.3d 1, 22 (Tenn. 2013).  The defendant is not entitled to relief on this issue.

## II. Sufficiency

The defendant challenges the sufficiency of the evidence, arguing that the evidence is insufficient to establish his identity as the perpetrator of the offenses.  In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn.  1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence.  State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010).  It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence.  State v. James, 315 S.W.3d 440, 456 (Tenn. 2010).  In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence.  See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Again, the defendant does not allege that the offenses of which he was convicted were not committed. He only challenges the evidence of his identity as the perpetrator. However, the identity of the defendant as the perpetrator of the offense is a question of fact for the jury. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The identification testimony of the victim is sufficient, alone, to support a conviction. Id. Here, viewed in the light most favorable to the State, the evidence shows that the defendant was one of the perpetrators of the offenses. An eyewitness, Fazil Rahman, identified the defendant as the shooter, and the defendant was connected with Mr. Rogers from the initial scene.

Dhaiban Mohammed recalled that two men in a silver car approached him at the service station at the corner of Hollywood and Poplar on the night of the incident, offering him drugs and prostitutes. After he declined and left the service station, the same two men passed him on the road and stopped in front of him at the stop sign. The men held Mr. Mohammed's car at gunpoint, robbed them, and started shooting at his car when he tried to drive away from the scene. Mr. Mohammed identified the co-defendant, Calvin Rogers, from a photographic array.

Fazil Rahman testified that he saw two men in a silver Honda talking to Mr. Mohammed at the service station. He described the driver as being bald, wearing a white tee shirt, and holding a puppy on a leash. He identified the defendant as the passenger and said that he had dreadlocks and a "heavy" mustache. Mr. Rahman testified that, after leaving the service station, the same two men cut off Mr. Mohammed's car at a stop sign, held him and his friends at gunpoint, demanded money, and then fired numerous shots at Mr. Mohammed's car as Mr. Mohammed drove away. Mr. Rahman subsequently identified the defendant from a photographic array, on which he wrote: "I don't know

him and I don't know his name. He robbed us and he shot us and he was [o]n the right side of the car on passenger right side." Mr. Rahman said that he was 100% sure of his identification of the defendant and that he recalled the defendant's face from the service station and when he stood on Mr. Rahman's side of the car trying to rob them.

Vernadette Neeley, the service station clerk and Mr. Rogers' former girlfriend, corroborated Mr. Rahman's description of the defendant and connected him to Mr. Rogers at the initial scene. She saw Mr. Rogers walk to his car, after he brought her a puppy, where a dark-skinned man with dreadlocks and a thick mustache was sitting.

Viewed in the light most favorable to the State, the evidence is sufficient for a rational trier of fact to find that the defendant committed the charged offenses.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE